IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 8, 2015

**IN RE: SERENITY L.**

**Appeal from the Juvenile Court for Washington County**
**No. 14655          James A. Nidiffer, Judge**

**No. E2014-02475-COA-R3-PT-FILED-JULY 31, 2015**

Christina L. ("Mother") and Ian C. ("Father") appeal the termination of their parental rights to the minor child Serenity L. ("the Child"). We find and hold that the Juvenile Court for Washington County ("the Juvenile Court") did not err in finding that clear and convincing evidence existed of grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(i) for abandonment by willful failure to visit and by willful failure to support and § 36-1-113(1)(A)(iv) for wanton disregard; and to terminate Father's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(iv) for wanton disregard and § 36-1-113(g)(9) for failure to manifest the ability and willingness to assume custody, risk of substantial harm, and failure to establish paternity. We further find and hold that the Juvenile Court did not err in finding that clear and convincing evidence existed that it was in the Child's best interest for Mother's and Father's parental rights to be terminated. We, therefore, affirm the termination of Mother's and Father's parental rights to the Child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Jessica C. McAfee, Greeneville, Tennessee, for the appellant, Christina L.

Sandy Phillips, Johnson City, Tennessee, for the appellant, Ian C.

Janie Lindamood, Johnson City, Tennessee, Guardian ad Litem.

Russell J. Kloosterman, Johnson City, Tennessee, for the appellee, Julie V.

# OPINION

## Background

The Child was born in January of 2013. Mother was incarcerated at that time. Just prior to her birth, the Child was adjudicated dependent and neglected. After her birth, the Child was released from the hospital to the custody of Julie V. The Child has remained in Julie V.'s exclusive custody since that time.

In February of 2014, Janie Lindamood, the Child's guardian ad litem, and Julie V. filed a petition seeking to terminate the parental rights of Mother and Father to the Child ("the Petition"). The case was tried in November of 2014.

The parties stipulated at trial that the relevant four month statutory period as to Mother's rights was September 28, 2013 to January 28, 2014. It was stipulated that Father was incarcerated from January 29, 2013 through trial, and the parties stipulated that the relevant four month period for Father was September 29, 2012 to January 29, 2013.

Sandra Rawls, Father's probation officer, testified at trial. Ms. Rawls was Father's probation officer from when Father was placed on probation on May 25, 2012 until his probation was revoked and he was ordered to serve his sentence on February 19, 2014.

Ms. Rawls explained that Father was placed on probation on May 25, 2012 in Washington County Criminal Court for possession of drug paraphernalia, simple possession of Schedule II, possession of Schedule II with intent to sell, driving on revoked license, and simple possession of Schedule III. Ms. Rawls testified that Father reported for intake on June 8, 2012. She stated that he was an hour and thirty minutes late for his appointment and that he argued with staff about the probation rules and kept staff in the office after regular business hours.

Father tested positive for cocaine on July 19, 2012. He also failed to make a payment on his probation fees and his court costs. Ms. Rawls testified that Father did not have a job and did not complete any community service. She stated that a violation warrant was issued on August 3, 2012 due to Father's positive drug test of July 19, 2012. Father's probation was revoked on October 4, 2012 and later reinstated with no change of the sentence expiration date of May 23, 2021.

Father was arrested on January 18, 2013 for driving on a suspended license. Father pled guilty to that offense on March 13, 2014 and was placed on unsupervised

probation for five months, twenty-nine days, which was to run concurrent with his criminal court cases.

Ms. Rawls testified that Father committed the offenses of resisting arrest and possession of cocaine for resale on January 29, 2013. A violation warrant was issued for Father's three new offenses on February 1, 2013. The charges of possession of cocaine for resale and resisting arrest were dismissed on February 19, 2014, but Father's probation in the criminal court cases was revoked and Father was ordered to serve 8 years, 11 months, and 29 days in the Tennessee Department of Corrrection.

Ms. Rawls testified that at the time of trial on the Petition Father did not have any future action dates scheduled until August 1, 2016 and that as of November 5, 2014, Father's sentence expiration date is April 14, 2019.

Father testified at trial. He testified that while Mother was pregnant with the Child, she told Father that it might be his child or the child of another man. After the Child was born Father received a photo of the Child on his phone and then received a phone call from Mother, who was in jail, telling him that the Child might be his child. Mother gave Father Julie V.'s phone number. Father testified that he contacted Julie V. on the day he received the number. Father testified:

> I called, I don't know if I called or texted, but I talked to Julie and I asked her if I could see [the Child]. She told me no, 'cause the judge said something, and then she told me that I don't need to worry about it because she took, she took [the Child] to the pediatrician and the pediatrician said the baby was white.

Father insisted that Julie V. told him that he did not need to worry about it.

Father admitted that prior to going to jail he told his sister and his mother that the Child might be his child. The Child was born on January 16, 2013. Father was incarcerated on January 29, 2013. Father admitted that he was not incarcerated until thirteen days after the Child was born and that he was notified of the Child's birth within days of the birth. Father admitted that he has no relationship with the Child.

Father did not pay anything toward prenatal or birthing expenses while Mother was pregnant with the Child. Father provided Mother with no support during Mother's pregnancy. Father admitted that he never has provided any support for the Child to Mother or to Julie V.

Father filed a petition seeking to establish paternity on September 13, 2013. Father was asked if he took any action to establish paternity within 30 days of the Child's birth, and he stated: "I was in jail. . . . No." Father, however, then admitted that he still was in jail when he filed the petition to establish paternity in September of 2013.

Father testified that he was employed with ACT prior to his arrest. Father could not recall how long he had worked for ACT. Father was asked how long before his incarceration he was fired from ACT, and he did not know. Father admitted that he had income available to him before he went to jail.

Father testified that he did not smoke before he went to jail, but that he did drink beer and liquor. He testified that his sister paid for the beer and liquor. Father testified that he was living with his mother prior to going to jail. He was asked if he paid rent to live with his mother, and Father stated: "I had a little bit of money saved up when I had a job, so I gave that to her." Father testified that he could not recall how much money he gave to his mother because it had "been almost two years ago, two, three years ago."

Father was asked if he paid for the drugs he had in his possession when he was arrested, and he stated: "No. . . . I was never actually with any drugs on my person." Father was asked if the drugs were in his vehicle, and he stated: "But I wasn't driving in 2013. That's two different incidents. My driving on revoked license is a different incident from when I was arrested for the resisting arrest, two different incidents." Father was asked where the cocaine was located when he was arrested in January of 2013, and he stated that it was on the ground. Father stated that he also was on the ground because he had been tazered. Father was asked if there was anybody else around at that time, and he stated: "No." He was asked if the cocaine fell off his person, and he stated: "No. They found it near where I was at." Father testified that when he was tazed the cocaine just happened to be lying on the ground close to him.

Father testified that he was not a cocaine dealer and that he did not use cocaine. Father then admitted that he "used it once. That's what I failed my drug test for." Father was asked how much the cocaine he used cost, and he stated: "I'm not sure." Father was questioned further about the cocaine, and the following exchange of questions and answers occurred:

Q. Now it's your testimony here today that you never used cocaine but one time?

A. Correct.

Q. And you acknowledge that you tested positive for cocaine in 2012 when that violation of probation [sic]?

A. Correct.

Q. And the eight year sentence that you've been convicted for, in that you were charged with possession of cocaine, as well as possession for resale or re-manufacture?

A. Correct.

Q. You still want to stick to that testimony that that was the - - you've only used cocaine one time?

A. Correct.

Q. All right. I guess you were innocent when you got that eight year conviction?

A. I guess I'm not if I'm doing eight years.

Father admitted that he has a disciplinary write-up for fighting on October 28, 2013. Father pled guilty to the write-up for fighting. He was asked if he had a history of propensity for violence, and Father admitted that he had "a simple assault."

Father admitted that he "probably did say" that the Child looked very much like another one of his children, and so he knew that it was a possibilty that the Child was his child. Father was twenty-three years old at the time of trial and had three children including the Child.

Father admitted that after the Child was born he exchanged text messages with Julie V. on January 23, 2013, and that during that text exchange he was advised that he would need to establish paternity if he wanted to see the Child. Father admitted that he responded by texting that he would call his attorney the next day. Father admited that the text exchange occurred before he went to jail, and Father stated that he "came to jail, what, five days later?" Father also admitted that during that text exchange he was advised that the case was in the Johnson City Juvenile Court before Judge Sharon Green, but that he did not try to contact the court.

Raymond Chismar, an investigative officer who works for the Tennessee Department of Correction, testified at trial. Mr. Chismar did a presentence report on

Mother for the offense of theft over $500. Mother was sentenced to one year of probation for that charge. When asked if he met with Mother, Mr. Chismar testified:

> I did not. Upon reviewing the file I did see what happened with her probation. . . . It looks like she was sentenced to one year of supervision for theft over 500 in Case 36415 and I found a revocation order which states that [Mother] never showed up at our office for any sort of community supervision and she was later revoked for absconding from probation and for some new charges and was ordered to serve one year in the TDOC.

The revocation occurred on May 13, 2014. Since the revocation, Mr. Chismar and his office are no longer in charge of supervising Mother, and they have had no dealings with Mother since the revocation.

Susan Holshue, a registered nurse, testified at trial. Ms. Holshue does volunteer work for CASA and was assigned to this case in approximately May of 2014. Ms. Holshue did a home visit with Julie V. She also spoke with Mother at the courthouse the last time the parties came to court. This was the only time Ms. Holshue met with Mother. Ms. Holshue never met with Father.

Ms. Holshue testified: "[Mother] called me a couple of times when it was – when she had requested visitation through the court and we spoke about how she needed to get more paperwork updated where the judge had allowed her visitation." Ms. Holshue explained that these calls happened about one month prior to trial. She stated: "It was after we had been to court and she asked about visiting and the judge said that we would keep the order as it was last fall and the court lady wanted a more update [sic] approval for court visit, for the Court Clinic visitation."

Ms. Holshue was asked what she found with regard to Mother, and she stated: "It was very difficult to contact her. A couple times I called and got a message on the phone number. Can't remember exactly what it said but might have said the mailbox is full or this number has no more minutes. And sometimes it went, just rang and never picked up." Ms. Holshue stated that Mother had given her a couple of phone numbers and that Mother had the CASA card with the information for how to contact Ms. Holshue.

Ms. Holshue was asked where Mother resided, and she stated: "I don't know her to reside any particular place. She told me she was residing with a friend and then when I tried to verify that I couldn't verify that information." Ms. Holshue never was able to verify where Mother was living. Ms. Holshue was asked what else she learned about Mother, and she stated: "Well, I knew she'd had some violations and that she was in jail

here in Johnson City when, at last court, and then I had heard she had gone to Carter County."

Ms. Holshue was asked what Julie V.'s house was like, and she stated: "Well taken care of, clean, plenty of clothes for [the Child] and appropriate toys." Ms. Holshue described the relationship between the Child and Julie V. stating: "Very close relationship. And even when I was there she wanted to show me around the house. She was a very friendly little kid. Had been well taught." Ms. Holshue testified that the Child and Julie V. appeared loving toward one another. Ms. Holshue was asked if she thought that removing the Child from Julie V.'s custody would harm the Child, and she stated: "That's the only place [the Child] has ever known as home, so yes, I think it would harm her."

Julie V. testified that she is not related by blood to either Mother or Father. Julie V. has known Mother all her life, and the two call each other cousins even though they are not related by blood. Julie V. explained that she has custody of the Child because, when Mother gave birth, Mother requested that Julie V. go to court and file a petition for custody so that the Child would not go into State custody. Julie V. was not present when Mother gave birth, but arrived shortly afterward and remained until the Child was released from the hospital. The Child was released from the hospital into Julie V.'s custody and has remained in Julie V.'s exclusive custody since that time. The Child was almost two years old at the time of trial. Julie V. testified that the Child is meeting all of her milestones.

Julie V. testified that she is financially able to provide for the Child. Julie V. is employed at Independent Living Solutions, and she stated that she was graduating soon and had contracted with Modern Women of America for a financial position. Julie V. has received no financial contribution of any sort from Father or Mother. Julie V. also has received no gifts for the Child from Mother or Father.

Julie V. is not married. She resides in a three bedroom house with her boyfriend, Aaron E., his daughter, and the Child. The four have resided together since February of 2013. The Child calls Julie V. "Mom." The Child calls Julie V.'s boyfriend "Daddy." The Child has had a parental relationship with Julie V.'s boyfriend since the Child was one month old. Julie V. testified that she never has been arrested or convicted of anything and there is no criminal activity in her home. She testified that her boyfriend also never has been arrested and has no criminal convictions. Julie V. testified that she has good family support from her parents, grandparents, aunts, and uncles. The Child calles Julie V.'s parents "Nana" and "Papaw Jimmy."

Mother had no visitation with the Child between September 28, 2013 and January 28, 2014. Mother had the right to exercise visitation with the Child during that time period through the Court Clinic. Julie V. testified that the Court Clinic did set up a visitation and the Child was present but Mother never showed up for that visitation.

Mother did have a visit with the Child between the time of the previous court hearing and trial. This visit occurred at McDonald's. Mother showed up to the visit approximately ten minutes late. Forty minutes after the visitation started the woman supervising the visitation called Julie V. and asked her to come pick up the Child. Julie V. and her boyfriend both went to pick up the Child. Julie V. testified:

> When we returned they were outside playing. [The Child] kept trying to come over to me and [Mother] handed her to me. We walked in and then she seemed, she seemed like she was going to be able to stay and play a little more. [The Child] seemed like she was going to be able to play a little more, so they sat down in the booth behind, actually directly in front of me. I was facing them. And [Mother's] eyes were barely open. She turned to point at something in the Play Place and she was slurring her words and obvious, to me, that she had taken something. . . . When she was looking, she'd turn to the side, was looking up and her eyes were only halfway open. . . . It continued through the remainder of the visitation. . . . Probably twenty or thirty minutes after we got there.

Mother did have three visitations with the Child that occurred outside of the relevant four month period. Julie V. testified:

> When [the Child] was first born [Mother], [Mother] called every day for maybe, I don't know exactly how long. But that was it. There's not, there's not been - - maybe a few conversations. I don't exactly remember. Not many conversations, no. . . . No, but any time [Mother] talked to me she didn't ask about [the Child]. She would call to yell at me or argue with me or ask me why did I do this, or she just don't understand. It was never about the child.

Julie V. was asked about the three visitations that Mother had with the Child outside of the relevant four month period, and she stated:

> Okay. The first one was, I don't remember the exact date; it was shortly after [the Child] was born. I went to go to pick [Mother] up, brought her to my mother's house. She was there for two or three hours. She never held the child and she stayed on the phone or texted the entire time. Even if she

did hold her, I don't recall that she did except for maybe a couple of pictures, but she talked to my mom for the whole time.

This visit occurred shortly after Mother was released from jail in April. Julie V. testified:

The next visit was a few months later, I don't recall the exact date, but it was at McDonald's and she, [the Child] was still in a carrier so she was still really small. And I took her to McDonald's and we sat in the Play Place and she looked at her and talked to her and played with her a little while. We were there about an hour and then we left.

Julie V. testified:

The third visit was at Rotary Park and . . . Rotary Park was in July. I think it was towards the end of July. I don't know the exact date. But that was after a court hearing and Judge Green said - - that's when Judge Green said to give the regular visitation 'cause before then it was just whenever the mother would call for whenever she wanted to see her. I took her to the park and every time I would try to get close to her she would take the baby off further away. I couldn't keep, couldn't keep them hardly in my distance, in my sight. And then she only came back when she needed a diaper. And at that visit she took [the Child] to a van of people that I did not know and as far as I knew, I didn't know what they were doing. I didn't know the people. All I knew is that there were several other people that had come to this visitation. It wasn't just her, like the visitations were supposed to be. So when we left the visit that day, first thing Monday morning I called the court, I spoke with Charlene Davenport and she expedited Janie Short to be able to do the visitations because I no longer felt comfortable to do that.

Julie V. was asked if the court already had ordered the Court Clinic to be involved in the visitations, and Julie V. stated: "Yes, she'd already ordered . . . the Clinic but she said I would do this one until the Court Clinic became available and that's why they expedited Court Clinic to become available immediately."

Julie V. would like to adopt the Child if she becomes available for adoption. Julie V. testified that the Child is bonded to her. She stated: "Well, she's constantly at my feet. If I take a step she takes a step. We do everything together. Sometimes she goes to work with me. She's – if I'm anywhere she wants to be there. We read books together. She constantly gives me hugs and kisses." Julie V. believes that it would harm the Child if she were taken from Julie V.'s custody and given to Mother. She stated:

[Mother] doesn't have a permanent home, so [the Child] wouldn't know where she's going to sleep from night to night. In my home she has a bed. You say, let's go to bed. She knows which room to go to. . . . [Mother] doesn't, [Mother] does not live a lifestyle that is conducive to having a toddler.

Julie V. was asked if she loved the Child, and she stated: "Yes, very much." She also testified that her boyfriend loves the Child and that the Child loves both her and Aaron E. Julie V. testified that Aaron E.'s daughter was ten years old at the time of trial and that she and the Child are like sisters and are "crazy about each other." Julie V. thinks it would be detrimental to both the Child and Aaron E.'s child if they were separated. She stated: "[The Child] has to tell [Aaron E.'s daughter] good night every single night, give her a kiss. And if she's not there for some reason we call and let her tell her goodnight over the phone."

Aaron E. testified that he was thirty-nine years old at the time of trial. Aaron E. has worked as an officer of the court for approximately eight years. Aaron E. was asked what kind of relationship he has with the Child, and he stated: "She's a part of my family. She, Julie lives with me. We call her [the Child], but [the Child's] a part of my family. She's very close to my daughter who's ten. There's no other way to say it, that she's a part of my family." Aaron E. testified that he loves the Child.

Aaron E. testified about the last visitation between Mother and the Child. This was the visit that took place on a Sunday afternoon in October at McDonald's. The visit was scheduled to be between 3:00 p.m. and 5:00 p.m. Aaron E. accompanied Julie V. and the Child to the visit, and they arrived around 2:45 p.m. Mother arrived at 3:07 p.m. Aaron E. testified that when Mother arrived "she was fine" and "friendly" and was not demonstrating any signs of being under the influence. The visit was supervised by Janie Short through the Court Clinic. A few minutes after Mother arrived, Aaron E. and Julie V. left. Approximately one hour later Julie V. received a call from Ms. Short asking her to come back. So Julie V. and Aaron E. went back to the McDonald's. They located Mother, the Child, and Ms. Short outside in a grassy area and the entire group went back inside the McDonald's and sat down. Aaron E., Julie V., and Ms. Short sat at one booth and Mother and the Child sat in a booth behind where Ms. Short sat. Aaron E. was facing Mother and the Child from where he was sitting. Aaron E. was asked if Mother was still "fine" and he stated:

No, Ma'am. Her - - she was speaking to [the Child] and her speech was very slurred, and if I remember right she was asking her about if she liked her chicken nuggets or liked her Happy Meal and her speech was very

slurred and her eyes were kinda rolling, kinda to the left and to the right and her eyelids were very heavy and she was kind leaned, leaned over to the side in her, in the booth, in the seat. . . . [T]hat's the way she was the rest of the visit. . . . I think we may have stayed another fifteen mintues or so, maybe twenty. It wasn't long. We didn't stay for the full, for the full hour after we got back. I think it was about another fifteen or twenty minutes, if that.

Aaron E. testified that Mother asked for the visit to be ended early.

Aaron E. was asked if he thought it would be in the Child's best interest to be returned to the custody of Mother or Father, and he stated:

My opinion is that it would absolutely be detrimental. Julie is that child's mother without a doubt. That's who she runs to for security. If she bumps her toe that's where she goes. That is her mom and it would absolutely be detrimental for [sic] to be anywhere else. I believe that with all my heart.

Aaron E. was asked if he thought it would be detrimental for the Child to be separated from his daughter, and he stated: "Yes. Absolutely. She loves [my daughter]. You know, that's her big sister and [my daughter] loves her. I mean, regardless, that - - she's our family. Two years is a long time." He was asked if he intended to remain a part of the Child's life, and he stated: "Absolutely."

Mother was late for trial and when asked about it she stated that she had written the date down for a different day. Mother stated: "I'm always on time at court."

Mother testified that she lives with her mother and has since she was released from jail. Mother was released from jail in April of 2013. She stated that she had lived with her mother continuously since her release. Mother was asked about a court order that found she was bouncing back and forth between her mother's home and her sister's home, and she stated: "Yeah, they was living, like right down the street from each other and my sister worked and I'd just go there and babysit and I'd stay there sometimes and . . . . But not permanently, I didn't permanently live with her."

Mother testified that she was employed at KFC for a little over a month. Mother was asked if she lived with her mother while she was working at KFC, and she stated: "I was living with Misty Buck. She's a friend of the family." Mother was asked why she testified that she was living with her mother non-stop and then stated that she was living with Misty Buck, and she stated: "Not non-stop through since she was born. I didn't - -

when she was - - when I was first released after she was born I lived with Misty for just a couple of months until I went back to my mom's."

Mother was asked again about her statement that she lived with her mother since her last release in October of 2014. Mother was asked why she gave Misty Buck's address as the place where she was living during the last court hearing. Mother stated: "I - - all of my mail and everything is still sent to her address. . . . It's the address that's still on my identification card." Mother was asked how many times she had resided with Misty Buck during the last two years, and Mother stated: "Maybe three." Mother was asked how many times she has lived with her mother during that time period, and she stated: "Of the times that I'm not living with Ms. Buck." Mother then was asked about living with her sister, and she stated "I never said I lived with my sister."

Mother admitted that she knew where the Child was but that she never sent any money for the care of the Child. She stated: "I asked Julie many times if she needed anything and she always said no." Mother was asked why she did not get the Child a birthday present, and she stated: "I'm not allowed to - - I mean, if I would've been allowed to see her or I don't even know, besides Julie's phone number I have no other way of contacting anybody or anything. . . . I knew who she was living with but not exactly where they - - I don't know exactly where Julie lives." Mother admitted that she knew that the Child was her child and that she was responsible for the Child but that she never paid any support for the Child during the relevant four month period. Mother also admitted that since the petition was filed she has paid no child support and has given the Child no gifts.

Mother was asked when the last time was that she held a job, and she stated: "Before I was incarcerated I was at ACT," for "[a] couple months. You know, just a month and a half." Mother admitted that she smokes "a couple [cigarettes] a day," and that she purchases "[m]aybe a pack a week." Mother was asked if she would be clean if she were drug tested that day, and she stated: "I'm prescribed Subutex and Klonopin." Mother presently is on house arrest "[m]onitoring through ACCP." Mother was asked who lives in the house with her, and she stated that her mother and her two nephews do.

Mother earned $7.50 per hour when she worked at KFC. Mother admitted that she is able-bodied and that there is nothing preventing her from working. Mother was asked if she drank alcohol and went out partying, and she stated: "I went out a couple of times." Mother admitted that she paid for her drinks. Mother testified that TennCare pays for her Subutex but that she pays for her doctor's visits. Mother admitted that she is supposed to pay $100 per week for the doctor's visits. Mother was asked where she gets the money to pay this expense, and she stated: "Either my sister or . . . . Mainly my sister." Mother

admitted that she had the ability to pay support for the Child during the relevant time period.

Mother was pregnant at the time of trial. Mother has two other children by different fathers. Neither of these two children are in Mother's care. The older one lives with the father's mother and the other lives with friends of the family. Mother never has had any of her rights terminated as to any of her children. Mother was asked if she visited her other children, and she stated: "Not recently. Not since I've been out." Mother was asked if she paid child support for her other children, and she stated: "No, sir. I'm not ordered to." Mother stated:

> If they need something, just like I said, Julie, I asked, I tried to and she always said that she didn't need anything, that she was taking care of that, was always the answer. There was clothes bought and Julie never took them with her when she was first born and . . . .

Mother was arrested in Washington County on November 29, 2012. She was transferred from Washington County to Carter County on April 24, 2013 and then released on bond on April 26, 2013. While Mother was incarcerated in Washington County she pled guilty to a write-up for having tobacco and tobacco paraphernalia. That occurred months after the Child was placed in Julie V.'s custody. Mother was arrested for theft of property in Unicoi County on January 29, 2014. Mother was transported to Carter County, released on January 31, 2014, and again was arrested in Carter County on October 10, 2014 at which time her bond was revoked. Mother was released on October 28, 2014. Mother's charge of theft of property in April of 2013 and the charges in January of 2014 in Carter County and Unicoi County occurred after the Child was placed in Julie V.'s custody.

Mother admitted that she has multiple theft charges. On June 22, 2013, after the Child was born, Mother pled guilty to a charge of reckless endangerment because she had marijuana in her system when she gave birth to another child. On June 27, 2013 Mother pled guilty to theft over $500. Mother admitted that on June 27, 2013 she "was charged with aggravated robbery and burglary and pled to simple assault."

At the time of trial Mother had criminal charges pending in Carter County for theft over one thousand dollars and possession of stolen property. Mother wrote a letter to the judge in connection with those charges in which she claimed she had straightened up and had a stable permanent home. Mother was asked where that home was, and she stated it was with her mother. Mother then was asked why she does not use her mother's address as her address but instead has testified on multiple occasions that she resides with Misty Buck, and Mother stated: "I have before. . . . Not in the last year."

-13-

Mother's pending charges are felony charges and she was unsure if she would have to serve jail time. Mother was asked if she was on house arrest and she stated: "On bond on one thing through the house arrest office. But I'm not on house arrest. I don't have to stay at my house all day. I just have to report to them once a week."

Mother agreed that she did not have a significant relationship with the Child. Mother admitted that her lifestyle at the time of trial was not an appropriate lifestyle for the Child to grow up in. Mother admitted that the Child was in a good placement with Julie V. She further admitted that Julie V. has provided for the Child financially and has met all of the Child's needs and that the Child and Julie V. are bonded. Mother admitted that she cannot provide the Child with stability and permanency. Mother was asked if she wanted to surrender the Child, and she stated: "I think she's best with Julie right now but I don't think it should be permanent." Mother agreed that it would be upsetting for the Child if she were removed from Julie V.'s custody and given to Mother immediately.

Mother was asked about the visit that occurred at McDonald's, and Mother testified that she was not intoxicated or under the influence. Mother admitted that during the relevant time period visitations were set up for her and the Child but that Mother did not attend those visits. She stated: "I didn't - - no, I hadn't spoken to her during that time."

Mother was asked if she were the same person now as she was when she was incarcerated and the Child was born, and she stated: "Yeah. Whenever she was first born. Like I didn't actually start, like the whole Subutex thing, none of that started until after all the problems, you know, with the Court Clinic and all that."

Mother admitted that she does not have a vehicle. She was asked if she had a license, and she stated: "It's paid off. I just have to go take the test." Mother then was asked if her license still was suspended, and she stated: "No. I just have to go take the test."

Mother was asked whether a drug test would show anything in her system other than the medicines she was prescribed if she were drug tested on the day of trial, and she stated: "I mean, I failed for marijuana but it's been almost a month. . . . It's been almost a month though. It was at house arrest yesterday and it wasn't." Mother was approximately eight months pregnant at the time of trial.

After trial the Juvenile Court entered its Final Order of Termination of Parental Rights on December 3, 2014 terminating Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(i) for abandonment for willful

failure to visit and willful failure to provide support and Tenn. Code Ann. § 36-1-102(1)(A)(iv) for wanton disregard, and terminating Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(iv) for wanton disregard and Tenn. Code Ann. § 36-1-113(g)(9) for failure to manifest ability and willingness to assume custody, risk of substantial harm, and failure to establish paternity. In its detailed Final Order of Termination of Parental Rights the Juvenile Court found and held, *inter alia*:

> [Father], the putative father, is properly before the court. As earlier discussed, [Father's] attorney, Ms. Sandy Phillips, filed an Answer to the Petition on the day of the hearing. Though incarcerated at the time of the hearing on the Petition to Terminate Parental Rights, [Father] was transported from the jail and appeared before the court during the entire proceeding.

> [Mother] is properly before the court. As stated herein, [Mother's] attorney, Ms. Jessical McAfee, filed an Answer to the Petition three days prior to the hearing. [Mother] was present for the afternoon session of the hearing on the Petition to Terminate her Parental Rights; however, she was excessively and inexcusably tardy. In fact, [Mother] failed to attend the morning session in its entirety, providing no legitimate explanation for her absence.

* * *

## FACTS ESTABLISHED BY CLEAR AND CONVINCING EVIDENCE AS TO MOTHER

Pursuant to a Johnson City Juvenile Court Order filed on July 29, 2013, [Mother] was afforded supervised visitations through the ETSU Court clinic. Clear and Convincing Evidence shows that [Mother] was present at the court hearing on June 3, 2013 — the day on which the Juvenile court [sic] granted and ordered supervised visitation through the Court Clinic. The mother was present at the court hearing on June 3, 2013, at which time the court granted and ordered supervised visitation through the Court Clinic.

For the Court's review, Ms. Janie Short, Director of the First Judicial Court

Clinic, prepared a report and a letter for the Mother. The report and letter were submitted into evidence as Collective Exhibit 5. The evidence showed that the ETSU Court Clinic arranged an intensive supervised visitation schedule for [Mother] and the minor child, with nine visits scheduled between August 24, 2013 and October 26, 2013. Despite the numerous opportunities to visit with her minor child, [Mother] was invariably a "no call no show." What's more, [Mother] made no contact with Janie Short for one year. In September 2014, [Mother] contacted Ms. Short, who — despite the mother's track record — arranged a two-hour supervised visit for September 21, 2014.

On the day of the scheduled visit, [Julie V.] and [Aaron E.] arrived with the child at McDonalds [the designated place of visitation] several minutes early. [Mother] arrived at 3:07 p.m., nearly ten minutes past the scheduled commencement time. As the visit progressed, Ms. Short became increasingly concerned about the sobriety of [Mother]. Upon [Mother's] request, the visit was prematurely terminated. Ms. Short has had no contact with [Mother] since the September 21, 2014 visitation.

[Aaron E.], who was present at the visit on September 21, 2014, testified that he observed part of the visitation. [Aaron E.] testified that he observed [Mother] slouching in a booth, slurring her speech, and nodding in and out of consciousness. [Aaron E.] stated that the mother appeared to be under the influence. In an attempt to discredit the testimonies regarding [Mother's] sobriety during the visit, Jessica McAfee - - attorney for [Mother] -- introduced pictures of the mother and child taken during the visit in which [Mother] did not appear intoxicated. [Aaron E.] testified that the pictures were an inaccurate depiction of [Mother's] sobriety insofar as still photographs fail to capture things such as eye movements.

It was established by the testimony of [Julie V.], that the mother did not visit or ask to visit the child for an appreciable time period.

It was established by clear and convincing evidence that the mother could have visited during the time that she was not incarcerated when visits could have been enjoyed. Nevertheless, visits were scheduled for her and she did not appear.

[Mother] acknowledged and testified that she failed to visit the child during the relevant four-month period, September 28, 2013 through January 28, 2014. Despite overwhelming evidence to the contrary, [Mother] maintained that her failure to visit was not of her own volition, but rather, the fault of the ETSU Court

-16-

Clinic Program. The record does not support [Mother's] contention. Rather, the evidence attributes the missed visitations to [Mother's] lack of cooperation with the ETSU Court Clinic Program, and thus, discredit [sic] [Mother's] testimony.

It was established by clear and convincing evidence that the mother abandoned the minor child by willfully failing to support the minor child in the four months prior to any incarceration. Period [sic]. September 30, 2013 until January 29, 2014 are the stipulated dates.

[Julie V.] testified that she received no form of child support during the applicable time (September 30, 2013 until January 29, 2014), nor has she received any form of child support since that date.

At the hearing, [Mother] testified that she was able to work and, did in fact, work for a period of time at Kentucky Fried Chicken. Further, Mother testified that despite her ability to pay child support during the time in question, she failed to do so. Instead, the mother used her earnings for her own needs and wants.

The four-month period prior to the filing of this Petition, rises to statutory abandonment.

All parties to this proceeding agree that [Mother] has never paid child support, including the four-month time frame in question. [Mother] testified that she was never ordered to pay child support to the Court. Despite her contentions, the record reflects that the Johnson City Juvenile Court set an order of child support. Although [Mother] was not present at said hearing, she was given sufficient notice of the order. Acting within the scope of her authority as an agent for and on behalf of [Mother], [Mother's] attorney at the time, Laurel Farrell, signed the order. As a result, [Mother's] assertions that she was unaware of her obligation to pay child support lack merit.

In accordance with the record and witness testimony, this Court finds that the Mother's conceded failure to visit and support the child during the four-month period preceding the filing of the termination Petition was willful. The Petitioners have proven by clear and convincing evidence that the Mother willfully failed to visit, support, and otherwise maintain any relationship with the child for a minimum of four consecutive months immediately preceding the filing of the Petition for termination. The Mother's failure clearly and convincingly shows a lack of effort or interest in having any relationship with the child, and accordingly, constitutes abandonment under T.C.A. §36-1-102.

-17-

* * *

This court finds that there is evidence sufficient to support a finding that the Mother engaged in conduct exhibiting wanton disregard for the child's welfare. [Mother's] refusal to tend to the physical, emotion [sic], and medical conditions of the child, coupled with her recreational drug use and abuse while pregnant, her propensity for engaging in criminal activity, and her periodic incarceration, constitutes conduct amounting to wanton disregard for her child's welfare.

Pursuant to a Johnson City Juvenile Court Order filed on July 29, 2013, [Mother] was afforded supervised visitations through the ETSU Court clinic. Clear and convincing evidence shows that [Mother] was present at the court hearing on June 3, 2013 — the day on which the Juvenile court [sic] granted and ordered supervised visitation through the Court Clinic.

* * *

It was established by the testimony of [Julie V.], that the mother did not visit or ask to visit the child for an appreciable time period. Furthermore, it was established by clear and convincing evidence that the mother could have visited during the time that she was not incarcerated when visits could have been enjoyed. Nevertheless, visits were scheduled for her and she did not appear.

It was established by clear and convincing evidence that the mother abandoned the minor child by willfully failing to support the minor child in the four months prior to any incarceration. Period [sic]. September 30, 2013 until January 29, 2014 are the stipulated dates.

[Julie V.] testified that she did not receive any form of child support during the applicable time (September 30, 2013 until January 29, 2014), nor has she received any form of child support since that date.

During the hearing, the Mother, . . . testified that she not only was capable of working, but that she was in fact, employed at Kentucky Fried Chicken. Further, mother testified that despite her ability to pay child support during the time in question, she failed to do so.

The above referenced order provides that [Mother] has paid no child support for the child. The hearing that generated the said order was held on February 19, 2014. The order was approved by the attorney for [Mother], and a copy was mailed to the putative father on the 25th day of February, 2014, as states the

certificate of service.

The said order of February 19, 2014, was never appealed and thus, is a final order in this matter. The current attorney, Ms. Jessica McAfee, for [Mother], states that the order has no effect on [Mother] since the certificate of service does not show it was mailed to [Mother], however, her previous attorney approved the order on behalf of [Mother], and therefore, [Mother] is bound by its provisions.

At trial, [Mother] testified that, since the birth of the minor child, [the Child]: 1) She has lived at multiple residences; 2) She has lived with her Aunt at least three times; 3) She has lived with her mother and sister also during relevant times; and 4) She never established a stable home for herself to take the child.

[Mother] explicitly admitted and implicitly acknowledged her inability to achieve and maintain a lifestyle conducive to the best interests of the child. In short, [Mother's] current [sic] reeks of instability and volatility. Accordingly, it is established by clear and convincing evidence that the mother — who has demonstrated an inability to obtain stability for herself alone — is wholly and completely incapable of providing a safe and stable home for the child at this time.

During trial, [Mother's] comprehensive criminal records were entered into evidence as Collective Exhibit 1; Collective Exhibit 6; and Collective Exhibit 10. The mother's criminal record is as follows:

i. 37843 - Wash Co. Reckless Endangerment - child born addicted drugs
ii. 36415 - Wash Co. Theft over 500 (a crime of moral turpitude)
iii. 36957A - Wash Co - Assault (a crime of violence)
iv. 22406 - Carter Co - Pending-Fraudulent use of Credit Card over 1,000
v. and Theft of Property over 1,000. (a crime of moral turpitude)

State of Tennessee Probation and Parole Officer, Mr. Ray Chismar testified that with respect to Docket Nos. 22406 and 22614, he conducted an investigation and completed a pre-sentence report, which was submitted for the criminal court on June 11, 2014. [sic] in regards to the mother on June 11, 2014 regarding Docket Nos. 22406 and 22614.

It was established by the testimony that [Mother] was in Carter County Criminal Court on October 10, 2014. At her appearance in the said criminal court on October 10, 2014, she tested positive for Marijuana, Subutex and Klonopin. As a result, the judge of the criminal court revoked her bond. [Mother] was incarcerated until October 16, 2014.

[Mother] is currently pregnant with her fourth child, with an estimated delivery date nearing the end of November 2014. [Mother] testified she smokes, indulges in parties, and consumes illegal drugs. She also testified that, if given a drug test on the day of the trial — she would likely test positive for Marijuana, keeping in mind that she is currently pregnant.

The mother opined that her present lifestyle is not appropriate to provide a safe and stable home for the child at this time.

An examination of the mother's records from the Washington County Detention Center demonstrate that the mother was searched at the detention center, and that she had illegal contraband on her person in the nature of tobacco products and rolling papers.

It is established by clear and convincing evidence that the mother has not visited as scheduled by the court clinic, nor has the mother paid child support.

Clear and convincing evidence was introduced at trial demonstrating the mother's willful and wanton disregard for the welfare of this child.

It is by clear and convincing evidence that the mother has willfully failed to visit, and she has willfully failed to pay child support.

It is shown by clear and convincing evidence that the mother's living conditions include a state of homelessness, consistent drug use and her lifestyle is motivated by criminal activity.

Based on the evidence of her most recent criminal conduct, [Mother] might face incarceration in the very near future.

Because [Mother] has failed to maintain contact and visit with the child, she has not established a meaningful parent-child bond with her child.

There is little evidence that the conditions that caused the removal of the child will be remedied in the near future in order that the child could be returned to either parent.

[Mother's] testimonial admissions, her lengthy criminal record, and the testimony of other witnesses as to her failure to visit and support the minor child, established by clear and convincing evidence that she willfully abandoned the child

in the the [sic] four-month period prior to the filing of this Petition. Not only does [Mother's] conduct prior to incarceration exhibit wanton disregard for the welfare of the child, but her repeated stents [sic] of incarceration indicate an unwillingness to change.

## GROUNDS FOR TERMINATION ESTABLSIHED AS TO MOTHER

This Court adopts its findings set forth above in the facts as to the mother without delineating the same. By clear and convincing evidence, the court finds that the evidence demonstrates that the mother's parental rights should be terminated for her willful failure to visit with her child and her willful failure to support her child. Both grounds exist due to the fact that the mother had numerous opportunities to visit with her child and she did not, and she had opportunities to pay child support or provide in kind support and she did not.

The mother states that she was never ordered to pay support, but as a parent, the mother has a duty to support her child, and she earned money that she used for her own devices, and was able to work to earn money for the support of her child.

The court directed the mother to the court clinic to establish visitation times with her child and she willfully failed to avail herself of the clinic's services. The court does not find the mother's assertions that the clinic did not respond to her appropriately concerning the visitation schedule is credible. In reality, if the mother felt that the court clinic was not addressing her visitation concerns, the mother should have petitioned the court for assistance. The record does not show that the mother availed herself of returning to the court that ordered the visitation in order to correct any problems that she may have had with the clinic.

Clear and convincing evidence entered demonstrates a willful and wanton disregard for the welfare of this child. Again, the court adopts its findings that the mother has lived at multiple residences. And, that the mother has lived with her relatives multiple times, and she never established a stable home for herself to take the child.

The mother's criminal record and her conduct while she has been incarcerated speaks for itself, and is a clear indication that the mother's primary interest is in her own wants and desires, and shows no interest in the child. It is important to note that the mother is facing additional criminal charges, and possible additional jail sentences.

[Mother's] extreme tardiness to the hearing on the petition to terminate her parental rights, coupled with her failure to pay support and failure to visit her child, establishes abandonment and wanton disregard by clear and convincing evidence.

## B. STATUTORY GROUNDS FOR TERMINATING THE PARENTAL RIGHTS OF THE PUTATIVE FATHER . . .

\* \* \*

This court finds by clear and convincing evidence that [Father's] pre-incarceration conduct, as well as his conduct while incarcerated, displays a wanton disregard for the welfare of the child. Further, [Father's] criminal behavior that resulted in his incarceration is indicative of a much broader pattern of conduct that renders him unfit and poses a substantial harm to the welfare of the child. . . .

\* \* \*

## FACTS ESTABLISHED BY CLEAR AND CONVINCING EVIDENCE AS TO THE FATHER

It was established by clear and convincing evidence that the putative father, [Father], abandoned the minor child, [the Child], due to the fact that he was incarcerated during the four month period prior to the filing of this Petition. Moreover, [Father] engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. The applicable time period being September 30, 2013 until January 29, 2014[.]

There was evidence presented at the hearing that establishes that [Father] was incarcerated on January 29, 2013. [Father] was incarcerated thirteen days after the birth of the child. [Father] has remained incarcerated since January 29, 2013, and he was brought from the Washington County Detention Center in order for him to participate at the hearing.

The following facts were stipulated at the trial:

A. On January 29, 2013, [Father] was arrested.

B. [Father's] criminal record was introduced at trial, at which time [Father] testified to the authenticity of the certified criminal court judgments setting forth his criminal history. He is currently serving an eight year sentence with a scheduled release date of April 14, 2019 for Possession of Cocaine for resale, with a consecutive 11 months and 29 day sentence for Driving of [sic] Revoked License, Violation of Probation, and Resisting Arrest.

C. Both sentences of the above charges were entered on January 29, 2014 on a violation of probation, resisting arrest, and possession of cocaine with the case numbers being 36295, 36845, 37496B respectfully [sic].

Ms. Sandy Rawles, [Father's] probation officer, testified at trial concerning [Father's] criminal court sentence. Ms. Rawles testified that [Father's] expected release date was April 14, 2019. Ms. Sandy Phillips, attorney of [Father], established via Ms. Rawles that it was possible for [Father] to be released earlier based on good time and the like. The court would note that a scheduled time for any early release is speculative at best, especially given the fact that [Father] has already been a party to an altercation in the Washington County Detention Center [for which he plead guilty and was found guilty in an "in house" hearing at the said detention center].

The evidence was established that [Father] received a picture of the minor child on January 17, 2013. The evidence did not clearly establish who sent the picture to [Father]; however, there is no dispute that [Father] did in fact speak to the mother and his sister expressing that [sic] fact the child appeared to look like one of his other children.

It was established by the evidence, that in [sic] January 17, 2013, [Father] sent a text message to [Julie V.] requesting that he be allowed to visit with the child. During the text messaging exchange, [Father] told [Julie V.] that the mother, [Mother], had informed him that [Julie V.] would allow him [sic] visit with the child.

In response to [Father], [Julie V.] informed him that there was a Court Order in place and that if he wanted to visit with the child that he would need [sic] contact the Johnson City Juvenile Court. Additionally, [Julie V.] advised that if [Father] wanted to have access to the child that he would need to establish paternity.

[Father] told [Julie V.] that the mother had informed him that the baby was white. [Julie V.] stated to [Father] that the doctor did in fact state that the child

appeared white, but she went on to tell [Father] that you could not tell the color of the child just by looking.

The text messages between [Father] and [Julie V.] were read one by one into the record, and as each message was read, [Father] (under oath and called as a witness) was asked to authenticate and to confirm each distinct feature of each of the text messages.

[Father] testified that the mother had notified him of her pregnancy and that he could possibly be the father of the child. The deoxyribonucleic acid (DNA) test results were entered into evidence demonstrating the [Father] was the biological father.

It was established by clear and convincing evidence that [Father] was on notice that the child was or quite possibly could be his child even before the child's birth. As testified to during the trial, [Father] had a picture of the child in question of which he acknowledged that the said child at least resembled one of his other children. [Father] did not file petition to establish paternity until the passage of eight months after the child's birth, and an [sic] no order was ever entered establishing paternity and legitimating the child. [Father] has never met the minor child.

At the hearing, [Father] testified that he made certain inquiries as to how to establish paternity. [Father] further testified that he had asked his sister, . . . , to obtain the paperwork from Johnson City Juvenile Court in order that he could file the appropriate papers to establish paternity. [Father] stated that his sister received the paperwork that he needed to establish paternity. [Father] stated that he completed the paperwork, and that he got the documents back to his sister.

[Father] testified that he maintained minimal contact with his sister. However, during [Father's sister's] testimony, she testified that they spoke weekly. [Father's sister] denied that her brother, [Father], asked her to obtain the proper paperwork from the Juvenile Court for purposes of establishing paternity. Further, she denied that she obtained any paperwork for [Father], but did acknowledge that in 2014. [sic] she and her mother went to the Johnson City Juvenile Court to determine why the deoxyribonucleic acid (DNA) testing had not been performed.

The testimony of [Father] and his sister are in direct conflict. The credibility of [Father] is questionable, and causes the court some concern as to the reliability of his testimony.

It is noteworthy that [Father's sister] testified that the mother sent [Father] a picture of the child on January 17, 2014, which, at a bare minimum, gave [Father] notice that he might be the father of the child.

At the present time, [Father] is incarcerated with a probable release date of April 14, 2019. During his testimony, [Father] freely admitted that he could not provide a safe and stable home for the child. [Father] cannot provide the child with permanency. [Father] waited eight months to file a petition to establish paternity and further, did not proceed to obtain an order legitimizing the child. [Father] was on notice that the child was or could be his child, before her birth. [Father] testified that he was in court on his criminal matters at least five times prior to the filing of his petition but never asked the Court or his attorney about filing to establish paternity.

This court doubts that the criminal court would ever attempt to advise [Father] on how to establish paternity, and his criminal defense attorney (especially if appointed) most likely would not have offered such advice. However, [Father's] testimony was that he never inquired of his criminal attorneys about his paternity matters at the time when he had the opportunity.

As previously stated, the deoxyribonucleic acid (DNA) test results do demonstrate that [Father] is the likely biological father of the child (as to the degree of certainty as contained in the DNA\Paternity testing); however, no court has ever entered an order establishing paternity.

Again as stated, [Father] testified that at present he had no ability to provide a safe and stable home for the child, and thus, he cannot offer the child permanency due to his present incarceration. [Father] is serving an eight-year sentence with a consecutive sentence of eleven months and twenty-nine days.

While [Father] did receive a picture of the child, he has never physically seen or met the child, and further, has not established a parent and child relationship with the child. Given the fact that [Father] has engaged in misconduct while incarcerated, it is unlikely that he will be subject to an early release date. If [Father] should serve his full prison term, the minor child will be six-years-old before any relationship could possibly develop.

It is by clear and convincing evidence that the minor child has bonded with [Julie V.], [Aaron E.], and [Aaron E.'s] child. The child looks to [Julie V.] as her mother, and looks to [Aaron E.'s] daughter as her sister. The child has a loving, stable home, and she enjoys a family relationship with the with [sic] [Julie V.'s]

household family. [Julie V.] and her family offer the child love, stability, and sense of permanency.

[Julie V.] testified that she is the one person that the child looks to when in need of medical attention, or any need the child might have. [Julie V.] lives with [Aaron E.], and [Aaron E.'s] daughter, and the child. From the testimony of both [Julie V.] and [Aaron E.], the court finds by clear and convincing evidence that the child has reciprocally loving relationship [sic] with each respective family member. Both children living in the [Julie V. & Aaron E.] household have formed a bond such as if they were actual sisters.

It was the testimony of [Julie V.] and [Aaron E.] that it would be detrimental to the child to remove the child from their care. Moreover, it would place the child at a substantial risk of harm if custody of the child was placed with the putative father. The Court agrees with this testimony, and the same is established by clear and convincing evidence.

[Father's] criminal records indicate that his lifestyle is one of violence, drug use, and illegal criminal activity. It will be noted by the court that [Father] was in fact incarcerated since January 29, 2013, which is only 13 days after the child was born.

All the findings set forth herein as to the mother, [Mother], and as to the putative father, [Father], had been made by clear and convincing evidence.

The court would note that there is an order in the record from the Juvenile Court of Johnson City, Tennessee, that finds that [Julie V.] has been the sole financial support for the minor child. The said order also finds, that [Father], putative father, is incarcerated and has never seen the child and has paid no child support.

\* \* \*

## C. BEST INTEREST OF THE CHILD

The second prong for termination of parental rights is for the court to determine if it is in the best interest of the child to terminate the parental rights of [Mother] and the putative father, [Father]. The court finds by clear and convincing

evidence, that it is in the best interest of the child that all of the parental rights of the mother, [Mother], and of the putative father, [Father], to [the Child], be forever terminated, and that complete custody, control and guardianship be awarded to the Petitioner, [Julie V.], with the right to place the child for adoption to consent to such adoption in loco parentis.

There is clear and convincing evidence pursuant to T.C.A. 36-2-223(I) [sic], that the mother and the putative father, have not made such an adjustment of circumstances, conduct, and conditions as to make it safe and in the child's best interest to be returned to the mother. The putative father is incarcerated and of course, cannot establish a home for the child, and may not for a substantial number of years.

The mother and the putative father have not provided reasonable child support for the child, and the mother as stated herein, has taken income that she has earned and used it for his [sic] own wants. The mother is able to work and support the child, but, she has made the choice to not financially support her child. The mother states that she has not been court ordered to support her child, but, this court finds that the mother has a statutory duty to support, and she cannot rely on the fact that a court has not imposed on her a specific child support obligation.

It is true that the putative father was incarcerated thirteen days after the child was born, and thus, has not been in position to provide child support or visit, and that he will quite possibly be in jail for a substantial amount of time.

The putative father's contention is that the mother was equivocal about the child being his child. The putative father contends that perhaps that mother secreted herself, and therefore, he could not pay any support for the child's prenatal expenses, and could not pay any support before being confined to jail. Moreover, the putative father asserted that he could not visit the child because of prior court orders, and due to the fact that he had not been adjudicated the legal father.

The court finds by clear and convincing evidence the putative father's condition of being incarcerated for the crimes delineated herein, and the jail terms that he must serve is because of his own conduct, and therefore, shows a wanton disregard for this child. Putative Father, [Father], never established a parental relationship with the minor child, has never established parentage, and never paid any support for the minor child.

[Father] failed to establish paternity within 30 days after notice of paternity; has never paid prenatal care, birth expenses, has not established a relationship with

the minor child and has failed to manifest an ability and willingness to assume legal and physical custody of the child. Moreover, [Father] has failed to grasp the opportunity to assert his inchoate parental rights with regard to the child.

[Father] abandoned the minor child insofar as the [sic] was incarcerated in the four month period prior to incarceration [sic] and engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. Evidence was entered that establishes that [Father] was incarcerated on January 29, 2013, thirteen days after the birth of the child. [Father] has remained incarcerated since that date. [Father], through his counsel, stipulated to these facts.

It is in the best interest of [the Child] and the public that this proceeding be brought; that all of the parental rights of the mother, [Mother] and the putative father, [Father], to [the Child] be forever terminated, and that the complete custody, control and guardianship of [the Child] be awarded to [Julie V.], the current custodian and perspective [sic] adoptive parent, with the right to place her for adoption and to consent to such adoption in loco parentis.

[Father] and [Mother] have failed to effect a lasting adjustment of their life styles and do not appear reasonably possible [sic] in the near future.

The putative father is incarcerated for a substantial period of time; the mother looking at the possibility of a lengthy jail sentence, [sic]

The mother is pregnant and using illegal drugs, and Subutex and Klonopin. The Mother has no permanent residence; has had at least five different residences and multiple incarcerations since the birth of the child.

[Father] and [Mother] have no parent child relationship with the minor child. [Father] has never seen or visited the child, and [Mother] has visited one time since July 2013, which would not constitute even token visitation. [Mother] has not requested of the court to correct any difficulties that she may have had with the court clinic, even if her testimony was credible concerning any problems that she may have had with the court clinic.

A change of caretakers and physical environment would be unquestionably detrimental to the child's emotional, psychological and overall well-being.

[Mother] has not paid child support consistent with the child support guidelines promulgated by the Department of Human Services pursuant to T.C.A. 36-5-101; and has not paid a reasonable portion of the child's substitute physical

care and maintenance when financially able to do so.

The minor is placed in a (kinship) foster home that wishes to adopt the child. The home is appropriate, safe, stable and permanent home. There is a strong parental child relationship between the custodian and child. The Custodian has met all of the child's needs, physically, financially and provided love and permanency[.]

It is important to note that the child has a tremendous bond with the daughter of [Aaron E.], and that it would be detrimental to both children to remove [the Child] from [Julie V.'s] home. It is established by clear and convincing evidence that both children view each other as siblings, and they have a strong love for each other.

It is in the child's best interest for the termination to be granted because neither the mother or putative father has [sic] not made changes in their conduct or circumstances that would make it safe for the child to be returned to either one of them, and neither or [sic] them has made lasting positive changes in their lifestyle or conduct.

It is in the child's best interest for the termination to be granted because there is not a true meaningful relationship between the mother and the putative father and the child, and that changing the caregivers of the child at this time would have a detrimental effect on the child.

It is in the child's best interest to terminate the parental rights of the putative father and mother because they have neglected the child as set forth in the history of these proceedings. The mother has never supported the child. The mother and putative father have shown little or no interest in the welfare of the child, and they have left the welfare of their child to others.

The child has established a strong bond with his [sic] current caregivers, and the current caregivers have developed a strong bond with the child, and they wish to adopt the child.

The court finds that all of the above findings have been based on clear and convincing evidence.

As set forth herein, there is clear and convincing evidence that it is in the best interest for the child, [the Child], to be made available for adoption.

# OTHER FINDINGS

The court adopts and incorporates the above findings and facts as the basis for the termination of the mother's and putative father's parental rights.

1. That the home of the current custodian, [Julie V.], meets the current needs of the child. The home of [Julie V.] has and can continue to provide the minor child with stability and continuity of care as well as meeting the child's physical, mental and emotional needs.
2. That full legal and physical custody shall remain with the Petitioner, [Julie V.], along with the authority to make decisions on behalf of the child, including medical and educational decisions along with the authority to place the child for adoption and to consent to such an adoption in loco parentis
3. That this decree and order shall have the effect of fully and forever terminating all of the rights, responsibilities, and obligations of the mother and putative father to [the Child] arising from the parental relationship, and that the mother and putative father are not hereafter entitled to notice of future proceedings of any type including adoption of the child by another not [sic] have any right to object to such adoption or otherwise participate in any future proceedings.
4. That after hearing the testimony of [Julie V.], and [Aaron E.], the court finds them very credible. . . .

Mother and Father appeal the termination of their parental rights to the Child to this Court.

## Discussion

Although not stated exactly as such, Mother raises four issues on appeal: 1) whether the Juvenile Court erred in finding that clear and convincing evidence was proven that grounds existed to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(i) for abandonment by willful failure to visit; 2) whether the Juvenile Court erred in finding that clear and convincing evidence was proven that grounds existed to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(i) for abandonment by willful failure to provide support; 3) whether the Juvenile Court erred in finding that clear and convincing evidence was proven that grounds existed to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(iv) for wanton disregard; and, 4) whether the Juvenile Court erred in

finding that clear and convincing evidence was proven that it was in the Child's best interest for Mother's parental rights to be terminated.

Father raises two issues on appeal, which we restate as: 1) whether the Juvenile Court erred in finding that clear and convincing evidence was proven that grounds existed to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(iv) for wanton disregard; and, 2) whether the Juvenile Court erred in finding that clear and convincing evidence was proven that grounds existed to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(9) for failure to manifest the ability and willingness to assume custody, risk of substantial harm, and failure to establish paternity. Although Father does not raise an issue regarding whether terminating his parental rights was in the best interest of the Child, in the interest of completeness we also will address this issue.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599

(1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 WL 1660838, at *6 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We first will address whether the Juvenile Court erred in finding that clear and convincing evidence was proven that grounds existed to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(i) for abandonment by willful failure to visit.

As pertinent, Tenn. Code Ann. § 36-1-113(g)(1) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (2014). As pertinent to this issue, Tenn. Code Ann. § 36-1-102(1)(A)(i) provides:

(1)(A)  For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i)  For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the a [sic] parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the a [sic] parent or parents or a guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i) (2014).

With regard to this issue the Juvenile Court found that Mother was afforded supervised visitations through the ETSU Court Clinic, that Mother was present in court on the day that supervised visitation was ordered, and that despite numerous opportunities to visit with the Child Mother was "invariably a 'no call no show.'"  The Juvenile Court further found:

It was established by the testimony of [Julie V.], that the mother did not visit or ask to visit the child for an appreciable time period.

It was established by clear and convincing evidence that the mother could have visited during the time that she was not incarcerated when visits could have been enjoyed.  Nevertheless, visits were scheduled for her and she did not appear.

[Mother] acknowledged and testified that she failed to visit the child during the relevant four-month period, September 28, 2013 through January 28, 2014.  Despite overwhelming evidence to the contrary, [Mother] maintained that her failure to visit was not of her own volition, but rather, the fault of the ETSU Court Clinic Program.  The record does not support [Mother's] contention.  Rather, the evidence attributes the missed visitations to [Mother's] lack of cooperation with the ETSU Court Clinic Program, and thus, discredit [sic] [Mother's] testimony.

The evidence in the record on appeal, as discussed more fully above, does not preponderate against the Juvenile Court's finding that clear and convincing evidence was proven that Mother willfully failed to visit the Child during the relevant four month period preceding the filing of the Petition.

We next address whether the Juvenile Court erred in finding that clear and convincing evidence was proven that grounds existed to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(i) for abandonment by willful failure to provide support. In pertinent part, the Juvenile Court found:

> [Julie V.] testified that she received no form of child support during the applicable time (September 30, 2013 until January 29, 2014), nor has she received any form of child support since that date.

> At the hearing, [Mother] testified that she was able to work and, did in fact, work for a period of time at Kentucky Fried Chicken. Further, Mother testified that despite her ability to pay child support during the time in question, she failed to do so. Instead, the mother used her earnings for her own needs and wants.

> * * *

> All parties to this proceding agree that [Mother] has never paid child support, including the four-month time frame in question. [Mother] testified that she was never ordered to pay child support to the Court. Despite her contentions, the record reflects that the Johnson City Juvenile Court set an order of child support. Although [Mother] was not present at said hearing, she was given sufficient notice of the order. Acting within the scope of her authority as an agent for and on behalf of [Mother], [Mother's] attorney at the time, Laurel Farrell, signed the order. As a result, [Mother's] assertions that she was unaware of her obligation to pay child support lack merit.

In her brief on appeal Mother argues that because the order setting child support does not show that it was mailed to her, that Mother was not on notice that she needed to pay child support. This argument lacks merit. As pertinent, Tenn. Code Ann. § 36-1-102(1)(H) provides:

> (H) Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children;

Tenn. Code Ann. § 36-1-102(1)(H) (2014).

The evidence in the record on appeal, as discussed more fully above, does not preponderate against the Juvenile Court's finding by clear and convincing evidence that Mother willfully failed to support or make reasonable payments toward the support of the Child.

Next, we consider whether the Juvenile Court erred in finding that clear and convincing evidence was proven that grounds existed to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(iv) for wanton disregard. In pertinent part, Tenn. Code Ann. § 36-1-102(1)(A)(iv) provides:

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; . . . .

Tenn. Code Ann. § 36-1-102 (1)(A) (iv) (2014).

With regard to this ground the Juvenile Court found, *inter alia*:

This court finds that there is evidence sufficient to support a finding that the Mother engaged in conduct exhibiting wanton disregard for the child's welfare. [Mother's] refusal to tend to the physical, emotion [sic], and medical conditions of the child, coupled with her recreational drug use and abuse while pregnant, her propensity for engaging in criminal activity, and her periodic incarceration, constitutes conduct amounting to wanton disregard for her child's welfare.

In her brief on appeal, Mother argues:

Mother avers that wanton disregard is exhibited when a parent takes actions known to be inconsistent with that of responsible parenting and that would likely place the child in danger or subject to an unjustifiable risk. [Mother], while charged and convicted of several crimes during the time that [Julie V.] had custody, did not subject the subject child to any harm or

danger. The mother only served several months of incarceration at a time, and was not incarcerated for such long durations that she could not parent the minor child, if given the opportunity.

Mother's argument is disengenuous. The only reason why Mother did not subject the Child to harm or danger by Mother's actions is because Mother did not have custody of the Child during the time period when Mother was engaging in this criminal behavior. Although Mother knew that she was a parent, Mother chose to continue to engage in a life of crime and drug use and abuse. Such actions demonstrate a wanton disregard for the welfare of the Child. The evidence in the record on appeal does not preponderate against the Juvenile Court's finding by clear and convincing evidence that Mother engaged in conduct amounting to wanton disregard for the Child's welfare.

We next consider whether the Juvenile Court erred in finding that clear and convincing evidence was proven that it was in the Child's best interest for Mother's parental rights to be terminated. When considering whether termination of parental rights is in the child's best interest a court is to consider the list of non-exclusive factors contained in Tenn. Code Ann. § 36-1-113(i).

The Juvenile Court made detailed and specific findings with regard to this issue, which are quoted in full above. We need not reiterate in detail these findings. We note that Mother herself admitted that her lifestyle is not an appropriate one for the Child and that multiple parties testified at trial that the Child is thriving in the custody of Julie V. and that it would be detrimental to the Child to be removed from Julie V.'s custody. The evidence in the record on appeal, as discussed more fully above, does not preponderate against the Juvenile Court's finding that it was in the Child's best interest for Mother's parental rights to be terminated.

Turning to the issues raised by Father, we first consider whether the Juvenile Court erred in finding that clear and convincing evidence was proven that grounds existed to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(iv) for wanton disregard.

With regard to this issue the Juvenile Court specifically found:

> This court finds by clear and convincing evidence that [Father's] pre-incarceration conduct, as well as his conduct while incarcerated, displays a wanton disregard for the welfare of the child. Further, [Father's] criminal behavior that resulted in his incarceration is indicative of a much broader pattern of conduct that renders him unfit and poses a substantial harm to the welfare of the child. . . .

The evidence in the record on appeal shows that days after the birth of the Child Father violated the terms of his probation by committing the offenses of driving on a revoked license and possessing cocaine for resale, among others. Father's probation was revoked and Father was ordered to serve his sentence. Father himself testified that Mother told him while she was pregnant with the Child that he might be the biological father. Father also testified that he received a photo of the Child days after her birth, that the Child looked like another one of Father's children, and that Father exchanged text messages with Julie V. about his potential parentage of the Child. At the very least, Father reasonably suspected that he might well be the Child's biological father when he committed the offenses that resulted in his probation being revoked. The evidence in the record on appeal does not preponderate against the Juvenile Court's finding that Father engaged in conduct prior to his incarceration that exhibited wanton disregard for the welfare of the Child.

Furthermore, the evidence in the record on appeal shows that Father has been written up during his incarceration for fighting. The incident that led to the write-up occurred after Father was on notice that he might be the Child's biological father, and further demonstrates wanton disregard for the welfare of the Child.

Next, we address whether the Juvenile Court erred in finding that clear and convincing evidence was proven that grounds existed to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(9) for failure to manifest the ability and willingness to assume custody, risk of substantial harm, and failure to establish paternity. In pertinent part, Tenn. Code Ann. § 36-1-113(g)(9) provides:

> (9)(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person or, if no such petition is filed, at the time of the filing of a petition to adopt a child, is not the legal parent or guardian of such child or who is described in § 36-1-117(b) or (c) may also be terminated based upon any one (1) or more of the following additional grounds:
>
> * * *
>
> (iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;
>
> (v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

-37-

(vi)  The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3);

(B)(i)  For purposes of this subdivision (g)(9), "notice" means the mailing, postage prepaid, or the sending by, express mail, courier, or other conveyance, to the person charged with notice at such person's address a statement that such person is believed to be the biological parent of a child. Notice shall be deemed received if the statement sent is not returned undelivered or evidence is not otherwise received by the sender that the statement was not delivered; and

(ii)  "Notice" also means the oral statement to an alleged biological father from a biological mother that the alleged biological father is believed to be the biological father of the biological mother's child;

Tenn. Code Ann. § 36-1-113(g)(9) (2014).

In his brief on appeal Father argues that this case should be found to be analogous to *State of Tennessee Dep't of Children's Servs. v. Williams* in which this Court held that the fact that the father was incarcerated and, therefore, did not have the ability to assume legal and physical custody of the child did not prove "a lack of desire or willingness to do so." *State of Tennessee Dep't of Children's Servs. v. Williams*, No. W2008-02001-COA-R3-PT, 2009 WL 2226116, at \*7 (Tenn. Ct. App. July 28, 2009), *no appl. perm. appeal filed*. The case now before us, however, is distinguishable from *Williams* because the father in *Williams* had called and written to the child and had provided support for the child "by the means available to him. . . ." *Id*. In the instant case Father never has written to the Child or called the Child. In fact, Father admitted that he has no relationship whatsoever with the Child. Furthermore, Father never has paid any support for the Child. Additionally, and importantly, the court in *Williams* implicitly found the father to be credible in his testimony, which is in direct contrast to this case wherein the Juvenile Court specifically found Father's credibility to be "questionable" and cause for "concern as to the reliability of his testimony." We give a trial court's credibility determinations great deference on appeal. *Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011). Thus, we find *Williams* to be distinguishable from the case now before us.

The Juvenile Court found that Father had not manifested an ability and willingness to assume legal and physical custody of the Child, that placing custody of the Child in

-38-

Father's custody would pose a risk of substantial harm to the physical or psychological welfare of the Child, and that Father had failed to file a petition to establish paternity within thirty days after he was given notice of his alleged paternity. Clear and convincing evidence of any one of these grounds would support a termination. Although Father argues that he was unable to establish paternity within thirty days because he was in jail, he admitted that he still was in jail when he finally took steps to file a petition to establish paternity nearly eight months later. Furthermore, as discussed above, the Juvenile Court found Father to be not credible. The evidence in the record on appeal, as discussed fully above, does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence.

Finally, we consider whether the Juvenile Court erred in finding that clear and convincing evidence was proven that it was in the Child's best interest for Father's parental rights to be terminated. When considering whether termination of parental rights is in the child's best interest a court is to consider the list of non-exclusive factors contained in Tenn. Code Ann. § 36-1-113(i).

The Juvenile Court made detailed and specific findings with regard to this issue, which are quoted in full above. We need not reiterate in detail these findings. We note that Father himself testified that he never has met the Child and has no relationship whatsoever with her and that multiple parties testified at trial that the Child is thriving in the custody of Julie V. and that it would be detrimental to the Child to be removed from Julie V.'s custody. The evidence in the record on appeal, as discussed more fully above, does not preponderate against the Juvenile Court's finding that it was in the Child's best interest for Father's parental rights to be terminated.

As grounds were proven by clear and convincing evidence to terminate both Mother's and Father's parental rights to the Child and it also was proven by clear and convincing evidence that it was in the Child's best interest for Mother's and Father's parental rights to be terminated, we affirm the Juvenile Court's December 3, 2014 judgment terminating Mother's and Father's parental rights to the Child.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellants, Christina L. and Ian C., and their sureties, if any.

_____
D. MICHAEL SWINEY, JUDGE